Michael L. Kirby (50895)
   mkirby@knlh.com
Malcolm B. Roberts (242431)
   mroberts@knlh.com
**KIRBY NOONAN LANCE & HOGE LLP**
350 Tenth Avenue, Suite 1300
San Diego, California  92101-8700
Telephone (619) 231-8666
Facsimile (619) 231-9593

Attorneys for Defendant GEMCO, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOND LABORATORIES, INC., a California corporation,<br><br>            Plaintiff,<br><br>      vs.<br><br>GEMCO, INC., a New Jersey corporation, and DOES 1-10, inclusive,<br><br>            Defendant. | CASE NO. 07CV2400 IEG (NLS)<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GEMCO, INC.'S MOTION TO COMPEL ARBITRATION, OR TO DISMISS FOR IMPROPER VENUE**<br><br>Date:   February 25, 2008<br>Time:  10:30 a.m.<br>Judge: The Hon. Irma E. Gonzalez<br>Crtrm: 1 |

KNLH\507977.1

07CV2400 IEG (NLS)

Defendant Gemco, Inc. ("Gemco") files this Reply Memorandum of Points and Authorities to Plaintiff Bond Laboratories, Inc.'s ("Bond") Opposition to Gemco's Motion to Compel Arbitration, Or Alternatively, to Dismiss for Improper Venue.

## 1. INTRODUCTION

Bond's Opposition to Gemco's Motion to Compel Arbitration, or to Dismiss for Improper Venue are based on the following assertions: (1) it never received Gemco's TERMS AND CONDITIONS containing the arbitration provision; (2) it had no knowledge of the arbitration provision requiring it to arbitrate any and all disputes between it and Gemco in Middlesex, New Jersey, nor consented to it; (3) it is unconscionable to force it to arbitrate its claims against Gemco in Middlesex, New Jersey; and (4) California public policy favors resolving disputes locally.

None of Bond's assertions are supported by law or fact. First, Bond fails to provide direct evidence to rebut the presumption that it did not receive Gemco's TERMS AND CONDITIONS which contained the arbitration provision. Second, Gemco has now obtained further evidence that Bond had knowledge of the arbitration provision and consented to it as there are Reply Declarations from Stephen Lutes and Alicia John attesting to the fact that they both sent Bond Gemco's TERMS AND CONDITIONS containing the arbitration provision. [Lutes Declaration, ¶7; John Declaration, ¶6.]

Third, Bond does not allege facts sufficient to support a theory of unconscionability because Bond does not allege any facts to suggest or imply that Gemco's arbitration provision was oppressive or one-sided. Fourth, Bond does not provide any authority for this Court to refused to enforce the forum selection clause that was agreed upon by Bond and Gemco. Therefore, this Court should enforce Bond and Gemco's agreement to arbitrate in Middlesex, New Jersey, or, in the alternative, dismiss or transfer this action to the U.S. District Court for the District of New Jersey.

/ / /
/ / /
/ / /
/ / /

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

**2.     BOND AND GEMCO ARE BOUND BY THEIR AGREEMENT TO ARBITRATE.**

    **A.  Bond Fails to Rebut the Presumption That It Did Not Receive Gemco's TERMS AND CONDITIONS In the Mail.**

       Bond asserts three arguments: (1) that Gemco's reliance on the mailbox rule does not show that the Terms and Conditions sheet was actually received; (2) the Declaration of Scott Landow is sufficient to overcome the mailbox presumption; and (3) Gemco had no reason to send mail to Bond's address in Murrieta.  None of these arguments are supported by the facts or the law.

         **1)  Gemco does not have to prove that Bond "actually" received its TERMS AND CONDITIONS.**

       Bond cites *Drazan v. United States* (7th Cir. 1985) 762 F.2d 56, 58, for the proposition that Gemco's reliance on the "mail box rule" does not show that the TERMS AND CONDITIONS sent by Gemco were "actually" received.  However, Bond's reliance on *Drazan* is misplaced for two reasons; first, *Drazan* does not address the validity of the "mail box rule" which has been well established by federal and California law; second, *Drazan* is irrelevant because the issue of "actual" receipt in this context was based on the District Court's interpretation of 28 C.F.R. section 14.2 and 38 C.F.R. section 14.604 which both pertain to the process of filing an administrative claim against a federal agency.

       Even though Bond claims Gemco can not prove that it sent the TERMS AND CONDITIONS via certified mail or otherwise, federal case law and California Evidence Code section 641 provides that Gemco does not have to do so.  Section 641 provides that a letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail.  See *Hoefs v. CAVC of Colorado, LLC* (D.Mass. 2005) 365 F.Supp.2d 69, 73 (noting that the "mail box rule" is a settled feature of the federal common law and provides that the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time.)

       Bond further alleges that the Declaration of Alicia John in Support of Gemco's Motion to Compel Arbitration fails to declare that she had personal knowledge of mailing the TERMS AND CONDITIONS.  This allegation is simply not true.  Paragraph 6 of Alicia John's Declaration clearly provides in pertinent part:

Kirby Noonan Lance & Hoge LLP

600 West Broadway, Suite 1100 San Diego, California  92101-3387

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1 | On August 17, 2006, I sent a letter with the attached TERMS AND
2 | CONDITIONS via U.S. mail addressed to Bond Laboratories at 38340 "H" Innovation Court Unit 803, Murrieta, CA 92562.

3 | (John Declaration, ¶6.)

4 | Because Alicia John declares under the penalty of perjury that she sent the TERMS AND

5 | CONDITIONS via U.S. mail to Bond, there is a rebuttable presumption that Bond received the

6 | TERMS AND CONDITIONS which contained the arbitration provision.  Bond's claim that actual

7 | receipt of the TERMS AND CONDITIONS must be proven is not only incorrect and not

8 | supported by any legal authority, but, more importantly, Bond's claim that actual receipt is

9 | required fails to rebut the presumption that it did not receive Gemco's TERMS AND

10 | CONDITIONS.  Therefore, Bond received Gemco's TERMS AND CONDITIONS which

11 | contained the arbitration provision.

12 | **2) Scott Landow's Declaration in support of Bond's opposition to Gemco's
13 | motion to compel arbitration does not overcome the "mail box rule" presumption.**

14 | Bond contends that Scott Landow's Declaration which declares that neither he, nor anyone

15 | else employed by Bond to his knowledge, received Gemco's August 17, 2006 letter (with the

16 | attached TERMS AND CONDITIONS) before Bond paid for the Blender in full is sufficient to

17 | overcome the mailbox presumption. [Landow Declaration, ¶ 20.]  However, Bond fails to provide

18 | legal or factual authority to overcome the mailbox presumption.

19 | Bond cites *Bailey v. U.S.*, (9th Cir. 1981) 642 F.2d 344, 347, for the proposition that an

20 | affidavit may rebut the presumption of receipt.  However, *Baily* is distinguishable from these facts

21 | because *Baily* involves plaintiffs who failed to comply with 28. U.S.C. section 2675(a) which

22 | required plaintiffs to present their claim in writing to the appropriate Federal agency within two

23 | years after the claim accrued.  In this instance, these facts do not deal with whether Gemco

24 | complied with section 2675(a).  Rather, these facts deal with Bond alleging that it did not receive

25 | Gemco's TERMS AND CONDITIONS containing the arbitration provision even though Bond has

26 | failed to produce conclusive evidence to rebut the presumption that it did not receive it.

27 | Interestingly, Bond cites *Schikore v. BankAmerica Supplemental Retirement Plan* (9th Cir.

28 | 2001) 269 F.3d 956, which actually supports Gemco's position that Bond has not rebutted the

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California  92101-3387

1  mailbox presumption.  In *Schikore,* the Ninth Circuit held that it was an abuse of discretion for an

2  ERISA plan to fail to apply the rebuttable presumption of the common law mailbox rule that a

3  letter mailed is received, when direct evidence of either receipt or non-receipt of the form was not

4  available.  *Id.* at 961.  The Court noted that the mailbox rule is a tool for determining, in the face

5  of inconclusive evidence, whether or not receipt has actually been accomplished.  *Ibid.*

6       Just as the *Schikore* court required direct evidence of non-receipt to rebut the mailbox

7  presumption, so should this Court require direct evidence from Bond of non-receipt to rebut the

8  presumption that the August 17, 2006 letter with the attached TERMS AND CONDITIONS was

9  not received.  Since Bond fails to provide direct evidence of non-receipt, it does not rebut the

10 presumption that it did not receive the August 17, 2006 letter with the attached TERMS AND

11 CONDITIONS.

12          **3)  The August 17, 2006 letter from Gemco to Bond was mailed to Bond's**
               **Murrieta address pursuant to Bond's Purchase Order.**

13

14       Gemco sent Bond a letter with the attached TERMS AND CONDITIONS on August 17,

15 2006 addressed to its attention at 38340 'H' Innovation Court Unit 803, Murrieta, CA 92562.

16 [John Declaration, ¶6.]  Gemco sent this letter to Bond's address in Murrieta because Bond

17 identified this address in its purchase order to Gemco.  [Landow Declaration, Exhibit B.]  Gemco

18 would not have sent this letter to Bond's Murrieta address if Bond would not have identified this

19 address in its purchase order.  While Bond attaches its tenant lease for the property located at

20 38340 'H' Innovation Court Unit 803, Murrieta, CA 92562 as an attempt to show that it did not yet

21 occupy that location, this fact is of no significance because it was impossible for Gemco to know

22 when Bond's lease was scheduled to begin.

23       **B.  Gemco and Bond's Agreement to Arbitrate is Valid and Enforceable.**

24          **1)  Bond knew about Gemco's provision that required it to arbitrate any and**
               **all disputes between it and Gemco in Middlesex, New Jersey.**

25

26       Bond asserts that it did not know that its contract with Gemco contained an arbitration

27 provision requiring it to arbitrate any and all disputes between it and Gemco in Middlesex, New

28 Jersey.  This assertion is contradicted by the following facts:

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1    (1) Gemco's California representative, Stephen Lutes, sent Bond's representative, Tom

2  Kucharski, a quote on July 13, 2006 which contained Gemco's TERMS AND CONDITIONS that

3  included the provision to arbitrate in Middlesex, New Jersey. See paragraph seven of Stephen

4  Lutes's Reply Declaration ("Lutes Declaration") filed herewith. A true copy of that quote is

5  attached to the Lutes Declaration as Exhibit A;

6    (2) Gemco's representative, Stephen Lutes received an email on August 8, 2006 from

7  Bond's representative, Tom Kucharski, confirming that Bond received Gemco's quote which

8  contained its TERMS AND CONDITIONS, which included the provision to arbitrate any and all

9  disputes in Middlesex, New Jersey [Lutes Declaration, ¶ 8, Exhibit B attached thereto.]; and

10    (3) On August 17, 2006, Gemco sent a letter with the attached TERMS AND

11  CONDITIONS via U.S. mail addressed to Bond at 38340 "H" Innovation Court Unit 803,

12  Murrieta, CA 92562. [John Declaration, ¶6.]

13    Bond relies on *Commercial Factors v. Kurtzman Bros.* (1955) 131 Cal.App.2d 133, for the

14  proposition that buyers in one state should not be forced into arbitration in another state unless

15  there has been a definite contract knowingly entered into containing such a provision. While this

16  general proposition may be true in certain circumstances, the facts in this case suggest that Bond

17  knew about Gemco's provision to arbitrate in Middlesex, New Jersey.

18    For instance, Bond not only received a quote from Gemco containing the arbitration

19  provision, but Bond's actual receipt of this quote that contained the arbitration provision was

20  confirmed by Bond's representative, Tom Kucharski, who sent Gemco's representative, Stephen

21  Lutes, an email noting that "the Gemco 5 cu ft blender quote is with Bond Labs management" on

22  August 8, 2006. [Lutes Declaration, ¶¶ 7-8, Exhibits A and B attached thereto.] In addition,

23  Gemco sent Bond a letter on August 17, 2006 with the attached TERMS AND CONDITIONS

24  containing the arbitration provision. [John Declaration, ¶¶ 6-7, Exhibits A and B attached thereto.]

25  Therefore, Bond had knowledge of Gemco's arbitration provision which would require it to

26  arbitrate in Middlesex, New Jersey.

27    **2) Bond consented to Gemco's provision to arbitrate in Middlesex, New Jersey**

28    Bond's contention that it did not consent to Gemco's arbitration provision because it was

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1   not obvious is not supported by citation to any evidence.  Bond's reliance on *Windsor Mills, Inc. v.*

2   *Collins & Aikman Corp.* (1972) 25 Cal.App.3d 987, where the court held that the plaintiff was not

3   bound by inconspicuous allegedly contractual provisions of which he was unaware and were

4   contained in a document whose contractual nature was not obvious is misplaced because those

5   facts are distinguishable from the case at hand.

6          Here, Bond had notice of Gemco's TERMS AND CONDITIONS because (1) it received

7   the same in the quote Gemco sent to it on July 13, 2006, (2) Bond's representative and lead

8   contact, Tom Kucharski, sent Gemco's representative, Stephen Lukes, an email on August 8, 2006,

9   confirming Bond's receipt of the quote which contained the TERMS AND CONDITIONS, and (3)

10  Gemco's August 17, 2006 letter which was only one page in length provided that "the attached

11  terms and conditions are part of this order." [Lutes Declaration, ¶¶ 7-8, Exhibit A and Exhibit B;

12  Johns Declaration, ¶6, Exhibit A.]  Notably, the August 17, 2006 letter instructed Bond to contact

13  Gemco for additional terms and conditions if the terms and conditions were not attached.  [Johns

14  Declaration, Exhibit A, ¶5.]  Bond never contacted Gemco to suggest that it did not receive its

15  TERMS AND CONDITIONS.

16          Gemco's provision to arbitrate in its TERMS AND CONDITIONS was below the section

17  titled "REMEDIES" which was in bold capital letters and is thus more factually similar to

18  *Rodriguez v. American Technologies* (2006) 136 Cal.App.4[th] 1110, where the court held that the

19  plaintiff assented to the arbitration provision  because the reverse side of the contract had the

20  heading "ARBITRATION" in bold capital letters.  In contrast, in *Windsor Mills, supra,* the

21  arbitration provision was only in small print.  25 Cal.App.3d at 990.  Furthermore, Gemco's

22  arbitration provision was easily discoverable because it was only one of Gemco's 23 TERMS

23  AND CONDITIONS that was only five pages long.  [John Declaration, Exhibit B.]  Thus,

24  Gemco's arbitration provision was not inconspicuous.  As a result, Bond consented to arbitrate any

25  and all disputes between it and Gemco in Middlesex, New Jersey.

26  / / /

27  / / /

28  / / /

Kirby Noonan Lance & Hoge LLP

600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  **3.    BOND AND GEMCO'S AGREEMENT TO ARBITRATE IS NOT UNCONSCIONABLE.**

2

3  **A.  Gemco's Arbitration Provision is Neither Procedurally or Substantively Unconscionable.**

4      Bond asserts that the arbitration agreement between it and Gemco should be invalidated

5  for being unconscionable.  While Bond correctly cites *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th

6  1064, 1071, for the proposition that unconscionability involves procedural and substantive

7  elements that focus on oppression or surprise due to unequal bargaining power that produce harsh

8  or one-sided results.  However, Bond fails to cite sufficient facts explaining why the provision to

9  arbitrate in Middlesex, New Jersey is unconscionable.

10      **1)  Bond does not cite facts sufficient to demonstrate procedural unconscionability.**

11

12      Bond's assertion that Gemco's arbitration provision is procedurally unconscionable is not

13  supported by the facts of this case.  Bond cites *Armendariz v. Foundation Health Psychcare*

14  *Services, Inc.* (2000) 24 Cal.4th 83, 113, for the proposition that oppression arises from an

15  inequality of bargaining power which results in no real negotiation and an absence of meaningful

16  choice.  However, Bond did not lack bargaining power when it purchased the Blender because the

17  purchase of the Blender was an arms length negotiation by experienced and sophisticated business

18  persons from Bond and Gemco.  Moreover, Bond had an opportunity to review Gemco's

19  arbitration provision on at least two occasions – first, when Gemco's sales representative, Stephen

20  Lutes, sent its quote which contained the arbitration provision to Bond's representative, Tom

21  Kucharski, on July 13, 2006; and second, on August 17, 2006 when Gemco sent Bond a letter with

22  the attached TERMS AND CONDITIONS that contained the arbitration provision. [Lutes

23  Declaration, ¶ 7, Exhibit A; John Declaration, ¶¶ 6-7, Exhibit A and Exhibit B.]

24      Bond then cites *Kinney v. United Healthcare Services, Inc.* (1999) 70 Cal.App.4th 1332,

25  1329, for the proposition that surprise involves the extent to which the supposedly agreed-on terms

26  of the bargain are hidden in the printed form drafted by the party seeking to enforce the disputed

27  terms.  While this general proposition may be true in certain instances, *Kinney* is neither

28  applicable to these facts nor persuasive in this matter because *Kinney* involved parties with

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1 unequal bargaining power (i.e. the enforcement of an arbitration provision by a corporate

2 employer who did not provide one of its employees with sufficient time to review its corporate

3 handbook which contained an arbitration provision.)   In this case, Bond and Gemco are both

4 corporate entities with equal bargaining power and Bond was not surprised by Gemco's arbitration

5 provision because it had an opportunity to review its TERMS AND CONDITIONS which

6 contained the arbitration provision on at least two occasions.  [Lutes Declaration, ¶ 7, Exhibit A;

7 John Declaration, ¶¶ 6-7, Exhibit A and Exhibit B.]

8 　　　Since Bond did not lack equal bargaining power with Gemco at the time it entered the

9 contract, it had a "meaningful choice" to reject Gemco's arbitration provision.  Moreover, Bond

10 was aware of Gemco's arbitration provision contained in its TERMS AND CONDITIONS on at

11 least two occasions.  Thus, Bond has failed to prove that Gemco's arbitration provision is

12 procedurally unconscionable.

### 2) Bond does not cite facts sufficient to demonstrate substantive unconscionability.

15 　　　Bond alleges that Gemco's TERMS AND CONDITIONS are substantively

16 unconscionable because Gemco's arbitration provision requires it to arbitrate its dispute in New

17 Jersey even though it is located in Solana Beach, California.  To support this contention, Bond

18 relies on *Commercial Factors Corp. v. Kurtzman Bros.* (1955) 131 Cal.App.2d 133, where the

19 court ruled that a California resident who purchased goods in New York was not required to

20 arbitrate its claims in New York based on inconspicuous language printed on the back of order

21 forms.  Bond's reliance on *Commercial Factors Corp.* is misplaced because it is factually

22 distinguishable from these facts since it involved a situation where the buyer was unable to see the

23 arbitration provision located on the reverse side of an order form which was "packaged together in

24 a pad." *Id.* at 134.  As such, the buyer could not even see the arbitration form.

25 　　　Here, Bond had an opportunity to review Gemco's TERMS AND CONDITIONS on at

26 least two occasions.  [Lutes Declaration, ¶ 7, Exhibit A; John Declaration, ¶¶ 6-7, Exhibit A and

27 Exhibit B.]  Hence, Bond was aware of the arbitration provision and the provisions which limited

28 its remedies against Gemco.  While Bond asserts that it would be overly harsh for it to arbitrate

1  this dispute in New Jersey, Bond was fully aware that Gemco is a New Jersey corporation.  The

2  email exchange between Crystal Basiluk and Scott Landow which identifies Gemco's location in

3  Middlesex, New Jersey serves as evidence that Bond's CEO, Scott Landow, was aware that

4  Gemco was located in Middlesex, New Jersey.  [Landow Declaration, Exhibit A.]  Hence, Bond

5  does not prove facts sufficient to demonstrate substantive unconscionability.

6  **4.    MIDDLESEX, NEW JERSEY IS WHERE BOND AND GEMCO AGREED TO ARBITRATE ANY AND ALL DISPUTES.**

7

8  Bond asserts that California public policy favors resolving disputes locally.  However,

9  Bond fails to provide any legal authority to rebut the validity of enforcing freely negotiated forum

10  selection clauses.  Instead, Bond provides general citation references to cases which note that

11  California has an "overriding public policy favoring access to its courts by resident litigants."

12  *Smith, Valentino & Smith v. Superior Court of Los Angeles* (1976) 17 Cal.3d 491 (quoting

13  Thomson v. Continental Ins. Co. (1967) 66 Cal.2d 738, 742).

14  Regardless of whether or not California public policy favors resolving disputes locally,

15  such public policy does not prohibit parties from freely negotiating forum selection clauses.  It has

16  been well established by federal statute and case law that parties may freely negotiate forum

17  selection clauses.  See 9 U.S.C. § 4.  See also *Snyder v. Smith* (7th Cir. 1984) 736 F.2d 409, 418-

18  419, *Dupuy-Busching General Agency, Inc. v. Amassado Ins. Co.* (5th Cir. 1975) 524 F.2d 1275,

19  1278, *M/S Bremen v. Zapata Off-Shore Co.* (1972) 407 U.S. 1, 12 [92 S.Ct. 1907, 32 L.Ed.2d

20  513].

21  Here, paragraph 16 of Gemco's arbitration clearly provided in pertinent part that "any and

22  all disputes shall be resolved by arbitration, in the *State of New Jersey, in the County of*

23  *Middlesex."* [John Declaration, Exhibit B, ¶ 16 (emphasis added).]  Therefore, any claims by

24  Bond against Gemco must be arbitrated in Middlesex, New Jersey even though California public

25  policy may generally favor resolving disputes locally.

26  / / /

27  / / /

28  / / /

Kirby Noonan Lance & Hoge LLP

600 West Broadway, Suite 1100 San Diego, California  92101-3387

1

## 5.    CONCLUSION

2      In light of the foregoing, Gemco respectfully requests that this Court order Bond to

3   arbitrate its disputes with Gemco in New Jersey pursuant to federal law, the FAA and in

4   accordance with the parties' written agreement, or in the alternative, dismiss or transfer this action

5   to U.S. District Court for the District of New Jersey.

6

      DATED: February 15, 2008                    KIRBY NOONAN LANCE & HOGE LLP

7

8

9                                      By: _____
                                           Michael L. Kirby
10                                          Malcolm B. Roberts
                                           Attorneys for Defendant GEMCO, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  Michael L. Kirby (50895)
     mkirby@knlh.com
2  Malcolm B. Roberts (242431)
     mroberts@knlh.com
3  **KIRBY NOONAN LANCE & HOGE LLP**
   600 West Broadway, Suite 1100
4  San Diego, California 92101-3387
   Telephone (619) 231-8666
5  Facsimile (619) 231-9593

6  Attorneys for Defendant GEMCO, INC.

7

8                **UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  BOND LABORATORIES, INC., a California          CASE NO. 07CV2400 IEG (NLS)
    corporation,
12                                                 **REPLY DECLARATION OF STEPHEN
                      Plaintiff,                   LUTES IN SUPPORT OF MOTION TO
13                                                 COMPEL ARBITRATION**
            vs.
14                                                 Date:  February 25, 2008
    GEMCO, INC., a New Jersey corporation, and     Time:  10:30 a.m.
15  DOES 1-10, inclusive,                          Judge: The Hon. Irma E. Gonzalez
                                                   Crtrm: 1
16                    Defendant.

17

18        I, STEPHEN LUTES, declare as follows:

19        1.      I am over the age of eighteen and am the owner of TECHNA-CAL which is located

20  at 22349 E. La Palma Ave., Suite 109, Yorba Linda, CA 92887.  I am competent to and would

21  testify to all matters set forth in this Declaration if called upon to do so as a witness.

22        2.      I have owned and operated TECHNA-CAL for approximately 19 years.

23        3.      As the owner and operator of TECHNA-CAL, among other things, I serve as

24  Gemco Inc.'s ("Gemco") Manufacturer Representative in Southern California.

25        4.      I have served as Gemco's Manufacturer Representative for approximately 19 years.

26        5.      I represented Gemco with respect to the sale of its 5 CF slant Cone Liq/Sol Agitator

27  Portable (the "Blender") to Bond Laboratories, Inc. ("Bond").

28        6.      I corresponded with Tom Kucharski of TK Consulting, who was Bond's

KNLH\508254.1                                                           07CV2400 IEG (NLS)

1   representative and lead contact for the sale of the Blender.

2       7.      On or about July 13, 2006, I sent Tom Kucharski a quote from Gemco which

3   identified, among other things, the total purchase price, terms of payment and Gemco's TERMS

4   AND CONDITIONS which included a provision for arbitration to take place in Middlesex, New

5   Jersey in the event of any and all disputes between Bond and Gemco. A true copy of Gemco's

6   Proposal to Bond's representative, Tom Kucharski of TK Consulting is attached hereto as Exhibit

7   A.

8       8.      On August 8, 2006, I received an email from Tom Kucharski, indicating that Bond

9   received Gemco's Proposal for the Blender. Attached hereto as Exhibit B is a true copy of the

10  email dated August 8, 2006 which I received from Tom Kucharski.

11      9.      On August 11, 2006, I received an email from Tom Kucharski confirming that

12  Bond was his client and that he (Tom Kucharski) was the lead contact on this project for the sale

13  of the Blender. Attached hereto as Exhibit C is a true copy of the email dated August 11, 2006

14  which I received from Tom Kucharski.

15      I declare under penalty of perjury under the laws of the State of California and the United

16  States of America that the foregoing is true and correct and this Declaration was executed on

17  February 14, 2008 at Yorba Linda, California.

18

19                                          Stephen Lutes

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

# EXHIBIT A

# TECHNA-CAL
"QUALITY PROCESS EQUIPMENT"
www.techna-cal.com

22349 E. La Palma Ave.
Suite #109
Yorba Linda, CA 92887

Phone: (714) 692-0353
Fax:    (714) 692-0350
E-mail: sales@techna-cal.com

## LIQUID-SOLIDS AGITATOR MODEL
## DIRECT-DRIVE PORTABLE BLENDER

### SIZE
   5 cubic foot working capacity
   55 percent fill level
   9.1 cubic foot total volume

**\*VESSEL SHAPE:** Slant Cone™

### MATERIAL DENSITY:
Blender designed to handle materials weighing up to 70 pounds per cubic foot.

### VESSEL CONSTRUCTION:
Vessel material: Vessel in contact with the material is constructed of 316 Stainless Steel . Trunnion and support pads are 304 stainless steel. All bearing shafts are carbon steel.

### VESSEL FINISH SPECIFICATIONS:
**Internal Finish:** I-2, similar to a #4 finish.  The entire surface is buffed to a uniform, appearance finish. However, not necessarily free of all fabrication, handling and pit marks. Overall surface rating of  30-45 ra

**Welds:**  All butt welds ground flush & smooth. All fillet welds ground smooth not flush.  All discoloration and weld splatter removed

**External Finish:** E-2, similar to a #4 finish.  The entire surface is buffed to a uniform, appearance finish. However, not necessarily free of all fabrication, handling and pit marks. Overall surface rating of  30-45 ra

**Welds:**  All butt welds ground flush & smooth. All fillet welds ground smooth not flush.  All discoloration and weld splatter removed

### SUPPORT FRAME CONSTRUCTION:
The Drive Station is a portable design including 2 swivel and 2 locking casters.  A clear acrylic safety gate is provided on the front of the unit and is hinged with a safety interlock to stop the blender and the agitator (if provided) when the gate is opened.  A stationary stainless steel panel is also provided on the rear and sides of the blender.  This safety device is specifically engineered for this unit with all necessary safety interlocks and operational sequence circuitry.

**Support frame material and finish:** Welded structural carbon steel tubing designed for ease in cleaning, painted with one coat of "Steel-It."

**Support Height**: Standard supports are used to provide the approximate valve clearance stated in the discharge valve section of this proposal.

**Safety Enclosures**: Shaft coupling and belt guards (for agitator units) are provided with the same material finish as that specified for the support frame.

## ACCESS COVER:
1 - 16.5" diameter quick opening removable vented cover is provided with stainless steel low profile clamps with aluminum tightening knob and white neoprene "O"-ring gasket seal.

## DISCHARGE VALVE:
6" butterfly valve, manually operated with a white Buna-N liner and an aluminum body. Clearance from discharge valve to floor is approximately 40".

## MAIN DRIVE:
A 1 HP motor rotates the vessel through guarded direct drive arrangement at between 23.5 RPM.

## LIQUID-SOLIDS AGITATOR DESIGN:
Agitator will be cantilever type, designed for critical speed and material impact, made of 316 stainless steel. Special agitator housing area contains pre-lubricated sealed ball bearings. The bearing is protected by the exclusive white Viton, V-Seals, which eliminates packing and extra nuts and bolts in the product contact area. This user-friendly assembly makes cleaning easy. Two (2) agitator discs are provided. Standard bolted agitator blade construction is provided.

A 5 HP induction motor drives the agitator through a guarded belt and sheave arrangement at approximately 3300 feet-per-minute blade-tip speed.

Liquid is fed through the rotary union into the agitator shaft to a splash housing/reservoir located between the agitator discs. High speed rotation of the agitator causes a capillary pull with atomization of the liquid sized according to the gap spacing set between the split discs, usually .010" spacers. Fine to coarse atomization can be controlled by changing the gap spacing. The liquid is centrifugally atomized to coat the material being blended.

Dispersion blades, attached to the dispersion discs, form a void around the agitator disc assembly. The high shaft speed builds up a slight pressure thereby aerating the dry materials and separating the particles.

## MOTOR ENCLOSURES: Wash Down

## MOTOR ELECTRICAL DESIGN: 3 Phase, 230/460 volt, 60 cycle

NOTE: Please indicate specific voltage when ordering.

## CONTROL PANEL:
The Deluxe Control Panel, NEMA 4X design, includes all motor starters, fuse blocks, terminal strips and control voltage transformer. Running lights, emergency stop red mushroom button, main quick disconnect, push-buttons for "Start-Stop-Jog" on the main motor, (and agitator, if so equipped), digital timer(s) for drive (and agitation, is so equipped) motor(s) and running lights are provided on the front of the panel. Complete control panel is of dedicated design specifically engineered to the unit as ordered including all necessary safety solenoid interlocks with air circuitry and operational sequencing as needed. This is not a standard buy-out bolt-on unit. Complete assembly includes necessary solenoids, pressure switches, etc., packaged and wired in flexible conduit to motor drives. Reference: P-D-4-1-5-460-60Fully pre-tested and mounted on the support frame, outside of the safety gate.

## WEIGHT: Approximately 1600 pounds.

## ELASTOMERS:
All provided elastomers are standard unless specified by the purchaser and/or user. The purchaser and/or user should perform its own tests to determine the suitability and fitness of the product(s) for the particular purpose desired in any given situation.

## PACKAGING INFORMATION

Blenders and dryers are shipped from GEMCO on a skid. Loose parts are packaged and strapped to the unit. Accessible or open connections will be wrapped. Skidding charges are as follows:

| | |
|---|---|
| ½ to 20 CF: | **$450.00** |
| 30 to 50 CF: | **$875.00** |
| 60 to 100 CF: | **$1,275.00** |

In some instances, larger pieces of equipment are broken down for shipment, otherwise all units are shipped as one (1) piece. This is done to make them shippable over the road or to fit through plant doors. If this service is required, GEMCO will provide a custom price based on the size of the unit, which is not included in the prices above.

## FREIGHT CHARGES

The buyer is responsible for all freight, export boxing, handling and insurance fees.

For overseas shipments all equipment should be export boxed and air tight to protect equipment from damage and weather conditions.

Your GEMCO representative can recommend freight forwarders and packaging companies on request.

Note: Any overseas shipment services (freight, freight forwarding, export boxing, handling and insurance fees) provided by GEMCO are payable prior to leaving Gemco's dock.

## GENERAL COMMENTS

This unit is equipped with anti-friction pillow block bearings.

All equipment is manufactured to United States Standards. Any standards required specifically for the equipment destination must be communicated to Gemco prior to acceptance of order. Special standards may result in an additional cost.

**BUDGET PRICE as QUOTED ABOVE**, f.o.b. Middlesex, New Jersey……………......$75,756.00

Note: All prices are in US Dollars. All purchase orders should be made out to "Gemco, 301 Smalley Avenue, Middlesex, NJ"

---

### NOTICE

Due to material surcharges now being levied by all stainless steel mills, the above total price includes a "mill surcharge". For your convenience we have included the surcharge in the total price and are offering you firm pricing for fifteen (15) days from the date of this proposal. After 15 days the price is subject to Additional surcharges.

---

## COMMISSIONING SERVICE

After installation, a Gemco Service Representative can be available for an installation and operation review. If necessary, minor field adjustments can be made to meet original factory specifications. The Service Representative will also provide an overview of proper operation and maintenance procedures. Contact your GEMCO Representative for information on current Field Service pricing.

## TRAINING SEMINAR

Upon inspection and acceptance of equipment by customer, Gemco will provide at its headquarters in Middlesex, NJ a one (1) day intensive operation and maintenance training seminar. The seminar covers installation procedures, operation, maintenance and a complete final review using your own piece of equipment if possible. Customer shall be responsible for its personnel's travel and living expenses.

## DOCUMENTATION

The following documentation is provided with the above Equipment:

- Manuals- Gemco manuals are provided as a standard item, in electronic format on a CD ROM. Hard copy manuals are available for an extra charge. Two copies of the CD are provided for each machine.

The Standard Gemco Machine Manual CDs shall include the following:

1. Machine drawings: mechanical, electrical and pneumatic.
2. Manufacturer's literature on major mechanical and electrical components such as VFDs, gear reducers, clutches, etc.
3. A custom machine description with safety interlocks and basic operation of controls.
4. Standard manual sections for various systems included such as a Gemcomatic drum loading system, agitator assembly, etc.

- Gemco FAT-on request, Gemco can supply a copy of our in house final testing report and signatures.
- IQ/OQ document-on request, Gemco can supply (in electronic version) an IQ/OQ template, to be completed by the buyer.

Notes:
1. Above standard items are furnished at **no additional charge** to the buyer. However, due to various requirements by individual buyers, additional charges may apply for items not listed above and/or variations of above items.
2. Any additional documentation, other than those items above, must be requested in writing by the buyer. Additional charges may apply.
3. When not available in electronic format, the seller shall supply documents as hard copies.

### ~ MATERIAL CERTIFICATION (CERTS) DOCUMENTS ~

Material Certification documents are available ON REQUEST * and are limited to product contact areas.
"Certificates of Compliance" documents will be issued for such items as nuts, bolts, screws, o-rings and other elastomers.
Material Certification documents can be provided at an additional charge and are NOT included in the price of the equipment.
Contact your local representative or Gemco for pricing. *** Requests for CERTS _cannot_ be accepted after orders are placed.**

For Purchase, Sales, or Service inquiries, please contact Steve Lutes at:
  TECHNA-CAL
  Phone:  714-692-0353
  Fax:  714-692-0350
  steve@techna-cal.com

- **WHEN PURCHASING SLANT CONE™ VESSELS, LOOK FOR THE ™ TO INSURE ACCURATE SCALABILITY.**

-

- **TERMS AND CONDITIONS:**

1. **GENERAL-** GEMCO Dryers and Blenders are manufactured for the purpose of processing free flowing powders.

2. **DEFINITIONS-**

*Buyer*- shall refer to the company and/or it's purchasing agent authorized to procure the end user.

*Seller*- shall refer to the General Machine Company of New Jersey and/or GEMCO.

3. **SHIPMENT**- All shipping dates and estimates are subject to: (i) the prior sale of equipment in inventory, Seller's manufacturing backlog, also any part thereof:  (ii) causes beyond the Seller's reasonable control; acts of god, fires, floods, epidemics, riots, wars, priorities and acts of civil or military authority; (iii) strikes, labor difficulties and shortage of labor; (iv) delays in transportation, car shortages and shortages in fuel power, materials and supplies; (v) acts of the purchaser and receipt of all required information and/or materials from purchaser. and (vi) time is not of the essence.

   All shipments are expressed as weeks after receipt of order (ARO) and/or after Buyer approval (see section # 22). All weeks are five (5) working days each, excluding Seller's Holidays and vacation shut downs

4. **WARRANTY-NEW EQUIPMENT**- The Seller warrants all equipment EXPRESSLY MANUFACTURED BY THE SELLER to be free of defects in workmanship and material. The Seller's obligation under the warranty is limited to repair or replace, at the Seller's discretion, any parts manufactured by the Seller and returned to the Seller's location, within one (1) year after delivery of equipment of it's manufacture to the original Buyer. The Buyer shall return to the Seller with transportation prepaid, at which time examination shall disclose to the Seller's satisfaction to have been defective.

   The Seller neither assumes, nor authorizes any other persons to assume for it, any liability in connection with the sale of it's equipment except under conditions of this warranty. Loud noises and excessive vibrations are unusual for this type of equipment and should be reported to the Seller immediately.  This warranty does not cover any labor charges for replacement of parts, adjustment, repairs, or any other work done.  This warranty shall not apply to any equipment which in the Seller's opinion has been subjected to misuse, negligence, improper installation or operating conditions in excess of design specifications as documented by the final proposal and/or engineering drawings issued by the Seller or which shall have been repaired or altered outside of the Seller's factory without express factory authorization.  This warranty shall not apply to equipment installed in hostile environs unless conditions were specified at the time of purchase. This machine is further not warranted and/or guaranteed to perform to any particular process, implied or specified by the Buyer or the Seller, nor fit for any process other than stated in section 1 above.

   Replacement of defective material will be F.O.B. Middlesex, NJ. Replacement of component parts not of the Seller's manufacture will be limited to the warranty of the specific manufacturer of such parts. The Seller will assist the Buyer in any third party warrantee claims.

   The Seller prior to work being performed must authorize all warranty service.

   Should a service engineer or shop mechanic be required for in-warranty repairs, the appropriate travel and living expense will be applied. A purchase order must be initiated by the purchaser before an engineer or mechanic is scheduled.

   **ITEMS NOT COVERED UNDER WARRANTY**- any wearable part such as, but not limited
   To seat rings bushings, o-rings, brake pads, etc.

   Drive shafts, bearings, gears, reducers and any other parts worn or damaged due to miss alignment and/or improper installation by others, other than an authorized factory representative will not be covered under this warranty.

   **REPAIRS**- should an in-warranty repair be necessary, in the judgment of the Seller and the equipment is impractical to return; the Seller will arrange for repairs by Seller's personnel or at Seller's option, subcontract to a qualified company. The Buyer will be expected to cooperate by making equipment available and accessible when the work is scheduled and is expected to provide the necessary utilities, equipment and assistance to facilitate repairs.

5.  **WAIVER AND MODIFICATION**- No waiver or modification of any of the Seller's terms and conditions shall be effective unless such waiver or modification is in writing and signed by an authorized representative at the office of the Seller in Middlesex, New Jersey.

6.  **INDEMNITY**- Buyer is responsible for and shall comply with all Local, Regional, State, Federal and International laws and regulations that govern the use of this type of equipment and its ancillary components. Buyer shall use and require its employees to use all safety devices, guards and proper safe operating procedures. Buyer shall not remove or modify any such device or guard or warning signs.  Buyer will be responsible for maintaining an interlocked enclosure around the machinery.  Buyer agrees to indemnify and save Seller harmless from any liability or obligation incurred by the Buyer to persons injured directly or indirectly in connection with the operation of such products.

7.  **TITLE**- Title for all parts and equipment ordered by the Buyer and risk of loss and/or damage shall pass to the Buyer upon delivery of parts and equipment to a carrier for shipment. The Buyer shall submit any claims for shortages or damages suffered in transit directly to the carrier. Also, Buyer shall notify the Seller of any damage(s) or shortage(s) within forty-eight (48) hours of receipt. Failure to notify Seller may void this warranty.

8.  **INSURANCE**- From date of shipment until the invoice is paid in full, purchaser agrees to provide and maintain at its expense, but for the Seller's benefit, insurance equal to the purchase price of the equipment against any loss or damage of any nature whatsoever.

9.  **PAYMENT TERMS**-
    *Established accounts*:
    a)  For orders under $25,000.00 our terms are net 30 days from shipment or upon notice that order is ready to ship.

    b)  For orders over $25,000.00 our terms are:
        Twenty percent (20%), due and payable after Seller accepts order, net 0.
        Forty percent (40%), due and payable six (6) weeks after order is accepted by Seller, net 30.
        Forty percent (40%), due and payable upon notice from Seller that the order is ready to ship, net 0.
    c)  All payments are due upon receipt of invoice.
    d)  When deliveries are less than 12 weeks, payment schedules will be adjusted.
    e)  Based on Buyer's credit references, Seller reserves the right to modify payment terms.

    *New accounts*:
        Fifty percent (50%), due and payable after Seller accepts order, net 0.
        Balance, due and payable upon notice from Seller that the order is ready to ship, net 0.
        (All payments are due upon receipt of invoice.)

10. **CHANGE ORDERS**- Any changes to Buyers original specifications which require additional engineering time, material and/or labor WILL result in delayed shipment and additional costs. No changes will be made without written authorization from the Buyer and/or a written change order to the original purchase order stating the nature of the change, price adder and new delivery.

11. **PURCHASE ORDER CANCELLATIONS**- Should cancellation occur after a purchase order has  been placed the following charges will apply according to the time of cancellation:
    a.  1 to 10 days - 15%.
    b.  11 to 30 days - 25%.
    c.  31 to 60 days - 40% plus material.
    d.  61 to 75 days - 55% plus material.
    e.  76 days to 90 days - 75% plus material.
    f.  90 days and over - 100%.

12. **INSPECTIONS**- The Buyer  is encouraged to inspect and/or witness mechanical testing of the

equipment can easily be changed have been made to the original specification and it is practical to return equipment for possible warranty claims, as outlined in Sections 4, 6, and 15. All written, mechanical specifications are inspected.

Case 3:07-cv-02490-EG-NLS    Document 8    Filed 02/15/2008    Page 21 of 27

13. **SPECIFICATIONS-** If the Seller submits any drawings and/or specifications for approval, the Buyer is required to approve or disapprove the drawings and/or specifications within the time frame as specified on the Sellers Engineering Drawing Transmittal Sheet. The Seller reserves the right to re-schedule production or to consider the order cancelled after ten (10) Days from the specified drawing return date if drawings are not returned. Cancelled orders are subject to fees as described in paragraph 13.

14. **RETURNS-** Permission to return any parts or equipment must be in writing and must be returned with transportation costs prepaid.  In the event equipment or parts manufactured by the Seller are returned, the obligation of the Seller is limited to repairing or replacing parts which, upon Seller's examination, are found to be defective in either material or workmanship. The Seller will pay no transportation charges, unless the Seller gives priors written approval for transportation charges.

15. **PRICING-**
All proposal prices are firm for thirty (30) days and subject to review after 30 days, unless otherwise noted.

16. **REMEDIES-** In the event of a dispute between Seller and Buyer, any and all disputes shall be resolved by arbitration, in the State of New Jersey, in the County of Middlesex. In no event shall the Seller be liable for special, incidental and/or consequential damages incurred; including, without limitation, lost profits.

17. **ENTIRE AGREEMENT-** The terms and conditions set forth herein, including all specification, drawings and other documents, expressly referred to in this proposal (order), contain the entire agreement between the Buyer and Seller and supersede all prior negotiations, agreements, understandings or arrangements between the Buyer and Seller with respect to the subject matter hereof.

18. **INTELLECTUAL PROPERTY** - All drawings, manuals, sketches, calculations, designs, promotional materials, video tapes, computer files and any other intellectual property conveyed to Buyer in whatever manner in conjunction with the equipment provided under this agreement, are and remain the property of Seller.  There is no assignment of any rights to such material whatsoever.

19. **APPLICABLE LAWS.**  This agreement shall be construed and interpreted in accordance with The laws of the State of New Jersey.

20. **REFURBISHED EQUIPMENT-** the Seller warrants all NEW parts EXPRESSLY MANUFACTURED BY THE SELLER to be free of defects in workmanship and material. The Seller's obligation under the warranty is limited to repair or replace, at the Seller's discretion, any parts manufactured by the Seller and returned to the Seller's location, within one (1) year after delivery of equipment of it's manufacture to the original Buyer. The Buyer shall return to the Seller with transportation prepaid, at which time examination shall disclose to the Seller's satisfaction to have been defective.

21. The Seller neither assumes, nor authorizes any other persons to assume for it, any liability in connection with the sale of it's equipment except under conditions of this warranty. Loud noises and excessive vibrations are unusual for this type of equipment and should be reported to the Seller immediately.  This warranty does not cover any labor charges for replacement of parts, adjustment, repairs, or any other work done.  This warranty shall not apply to any equipment which in the Seller's opinion has been subjected to misuse, negligence, or pressures in excess of limits shown as operating conditions by the Seller or which shall have been repaired or altered outside of the Seller's factory without express factory authorization.  This warranty shall not apply to equipment installed in hostile environs unless conditions were specified at the time of purchase. This machine is further not warranted and/or guaranteed to perform to any particular process, implied or specified by the Buyer or the Seller, nor fit for any process other than stated in section 1. Above. Replacement of defective material will be F.O.B. Middlesex, NJ. Replacement of component parts not of the Seller's manufacture will be limited to the warranty of the specific manufacturer of such parts. The Seller will assist the Buyer in any third party warrantee claims.

The Seller, prior to work being performed must authorize all warranty service.

Should a service engineer or shop mechanic be required for in-warranty repairs, the appropriate travel and living expense will be applied. A purchase order must be initiated by the purchaser before an engineer or mechanic is scheduled.

All existing parts EXPRESSLY MANUFACTURED BY THE SELLER are warranted for 90 days. Any other parts are NOT warranted.

22.    **ORDER CLASSIFICATIONS** – (All orders are subject to acceptance by Seller and credit approval of Buyer)

**ALL ORDERS ARE ACCEPTED BY GEMCO AS CERTIFIED:**
Certified shall mean that the Buyer has issued a purchase order, in writing, based on the sell price, completion date (expressed as weeks ARO), terms and conditions. Gemco will initiate all phases of engineering, purchasing, manufacturing and issue "certified' drawings for the equipment being built.

**APPROVAL ORDERS – WHEN REQUESTED BY THE BUYER:**
Approval shall mean that the Buyer has issued a purchase order based on the sell price, terms and conditions proposed and completion date (expressed as weeks after "customer approval" of drawings). Gemco typically issues "approval" drawings 2-4 weeks ARO.

However, purchasing of material and manufacturing will NOT proceed until AFTER Buyer approves drawings and/or both the Buyer and GEMCO accept changes. The Buyer may authorize, in writing, certain items as certified to proceed with purchasing and manufacturing to expedite delivery.

Please note: the Buyer must authorize ALL requested changes in writing.  Changes that affect price and/or delivery require a change order(s) to the original purchase order from the Buyer.

23.    **INSTALLATION and CLEANING-**The Buyer is responsible for the rigging, installation, alignment and utility connections of the purchased equipment. The Seller does not certify the equipment to be clean for Buyer's production purposes. Further, the Buyer is responsible for cleaning and removing materials used by the Seller, in the normal course of manufacturing equipment, to meet Buyer's process requirements. Unless, specified all units are NOT passivated.

All equipment is manufactured to United States Standards.  Any standards required specifically for the equipment destination must be communicated to Gemco prior to acceptance of order.  Such standards may result in an additional cost.

# EXHIBIT B

*Tomrigel@aol.com* wrote:

From: Tomrigel@aol.com
Date: Tue, 8 Aug 2006 14:16:49 EDT
Subject: Gemco Quote
To: steve@techna-cal.com

Hi Steve,

The Gemco 5 cu ft blender quote is with Bond Labs management.
When we last spoke, you were going to send me info and/or quote on Sweco sieving equipment but I haven't received them yet.

Thanks,
Tom Kucharski
TK Consulting
26911 Quevedo Lane
Mission Viejo, Ca  92691
Phone: (499) 348-0230
Cell: (949) 683-8356

# EXHIBIT C

From: Tomrigel@aol.com
Date: Fri, 11 Aug 2006 15:05:15 EDT
Subject: Gemco Quote
To: steve@techna-cal.com

Hi Steve,

Attached is the Purchase Order for the 5 Cu Ft slant cone that you provided the quote for  several weeks ago. It is from Bond Laboratories, who is my client on this project and which I am the lead contact on. Anything that you can do to shorten the delivery date will be appreciated.

BTW, the required voltage is 230 volts.

Thank you,
Tom Kucharski
President
TK Consulting
26911 Quevedo Lane
Mission Viejo, Ca 92691
Tel: (949) 348-0230
Cell: (949) 683-8356

**PROOF OF SERVICE**

|  | |
|---|---|
| DATE: | February 25, 2008 |
| TIME: | 10:30 a.m. |
| DEPT: | 1 |
| TRIAL DATE: | Not Applicable |
| JUDGE: | Irma E. Gonzalez |

Bond v. Gemco
United States District Court Case No. 07CV2400IEG (NLS)

I, the undersigned, declare: That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and I am employed in the County of San Diego, California. My business address is 600 West Broadway, Suite 1100, San Diego, California 92101-3387.

On February 15, 2008, at San Diego, California, I served the following document(s) described as

**1.    REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GEMCO, INC.'S MOTION TO COMPEL ARBITRATION, OR TO DISMISS FOR IMPROPER VENUE;  AND**

**2.    REPLY DECLARATION OF STEPHEN LUTES IN SUPPORT OF MOTION TO COMPEL ARBITRATION;**

on the parties in said action as follows:

| | |
|---|---|
| Micha Danzig (177923)<br>Juan C. Castañeda (240705)<br>Mintz Levin Cohn Ferris Glovensky &<br>    Popeo, PC<br>5355 Mira Sorrento Place, Suite 600<br>San Diego, CA  92121<br>Telephone: 858-320-3000<br>Facsimile: 858-320-3001 | Attorneys for Plaintiff Bond Laboratories, Inc. |

☒    **ELECTRONIC TRANSMISSION:** I filed the foregoing document with the Clerk of Court for the United States District Court, using the Electronic Case Filing ("ECF") system of the Court. The attorney listed above has consented to receive service by electronic means and is registered with the Court's ECF system and was served a "Notice of Electronic Filing" sent by ECF system.

☒    **STATE COURT:** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 15, 2008, at San Diego, California.

/s/ Lorri Ann Taylor

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387